IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PATSY MESTER, EVERETT LINGLEO, TERRY DAVIS and RICHARD HAYNES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 08-3080 |
| OTTER LAKE WATER COMMISSION, ADGPTV, | ) ) ) ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

This case is before the Court on Defendant's motion for summary judgment.

This is a civil rights action pursuant to 42 U.S.C. § 1983, wherein the Plaintiffs allege in Count I a deprivation of property without due process. Count II contains a pendant state law claim for inverse condemnation.

### I. BACKGROUND

(A)

Defendant Otter Lake Water Commission, ADGPTV, ("the

Commission" or "the Defendant") is a public corporation established in the late 1960's pursuant to Division 135 of the Illinois Municipal Code, 65 ILCS 5/11-135-1 et seq., originally pursuant to an intergovernmental agreement among the municipalities of Auburn, Divernon, Girard, Pawnee, Thayer and Virden, Illinois. The Commission presently owns and operates a wholesale water production and distribution system serving the original six members plus the Village of Nilwood, as well as a number of retail customers in unincorporated areas in Sangamon and Macoupin Counties, Illinois. The Commission's main reservoir is Otter Lake in Macoupin County. The Plaintifs are four individuals who, along with over 100 others, occupy camping space on the Defendant's real estate.

Pursuant to 65 ILCS 5/11-135-3, the Commission has the following statutory powers as they relate to operation of a recreation system:

> The commission is authorized to develop, promote and provide for recreational facilities on property acquired in and for the operation of its common source of supply of water and to include reasonable charges for such recreational facilities as part of the cost of operation and maintenance of the waterworks system.

As part of its statutory mandate, the Commission operates a recreational

system at Otter Lake. The system includes a campground consisting of 254 campsites.

The Commission alleges that since the inception of the campground in the early 1970's and through October 16, 2007, the campground was operated by so-called "Concessionaires," who leased the campground from the Commission and, in turn, subleased campsites to seasonal campers such as the Plaintiffs in this case. The Plaintiffs dispute that their relationship to the other campers was as sublessees. The Concessionaire at the time was the husband-wife team of Jack and Peggy Roberts and, after Mr. Roberts's death, Ms. Roberts alone. The Commission further asserts that the Roberts lease provided that the Concessionaire would sublease the campgrounds to campers at rates established by Commission ordinances and would observe and enforce Commission ordinances within the campground, and would permit tenant improvements only according to Commission specifications. The Roberts lease expired, after all option periods, in November 2007. The Plaintiffs contend that the evidence is inconsistent with a standard owner-lessee-sublessee legal relationship. The lease with the Robertses provided

3

that the ordinances of the Defendant "shall be legally supreme to any provisions of the lease."

The Commission alleges that the subleases had no express expiration date and were renewed annually. Either from camp scuttlebutt or discussions with the Robertses, the Plaintiffs all believed that the subleases were perpetual in duration, in the sense that if the Plaintiffs observed all camp rules, their subleases would be renewed annually in perpetuity. The Commission further asserts that two of the Plaintiffs knew that the Concessionaires themselves held the campground pursuant to a lease, but the other Plaintiffs were unaware of the precise arrangement. No Plaintiff obtained any title work on their camping lot before securing a sublease. Although they knew that the Roberts's term as concessionaires had a defined expiration date, the Plaintiffs say that they believed their right to the campsites survived that expiration date.

(B)

Beginning in 1993, when the Robertses took over as Concessionaires, the Commission began the process of imposing a uniform set of standards

pertaining to "portable" improvements, such as roofs and patios, which could be made by sublessees. In consultation with a contractor who was in the business of constructing such decks, roofs, etc., the Commission established a set of Specifications for tenant improvements. At the same time, the Commission adopted an ordinance, which banned "fixtures," although the specifications required roofs over campers to be anchored in the ground as a safety measure.

The Defendant has, through its Commissioners and General Manager, admitted that the improvements built by the Plaintiffs are and always were the personal property of the Plaintiffs. This characterization applies even though the improvements are permanently affixed to the site. The Plaintiffs cite the testimony of Dennis Ross, the General Manager of the Commission, in alleging that even under the new ordinance, if a camper left his site and left behind the improvements, ownership of those improvements would pass to the new camper and not to the Defendant. The Defendant notes that Ross also testified that a departing camper who leaves improvements in place is in breach of the campsite lease. However, the Commission does not

tear down the improvements, but leaves a new camper the option of tearing down the improvements or leaving them in place.

In 2001, the 1997 Specifications were also incorporated into Ordinance No. 2001-01, Exhibit 5 to the Ross Affidavit, which also required that all non-conforming structures erected by tenants would be removed by December 31, 2007– that is, upon the cessation of the Roberts lease. In conjunction with Ordinance No. 2001-01, the Commission developed an "Addendum," to be executed by all campers along with their initial Subleases. The Addenda banned permanent fixtures while permitting "portable" patios, porches and roofs, subject to certain specifications and approval.

The Commission alleges that, while the Roberts lease was in effect, subleases were transferable. When a sublessee made improvements to a campsite, the improvements could be sold in a private transaction along with the camping trailer. The Commission was aware of these transactions and required as a condition thereof, that there be an inspection for any nonconformities with the 1997 Specifications. The Concessionaire charged

$300 for a transfer and in turn paid the Commission $100 to cover the cost of the inspection.  The transfer document provided, as did Ordinance 2001-01 and the Addenda, that the Commission would have no liability with respect to the transfer.  The Plaintiffs contend that the language most relevant to this action, regarding the right to sell one's improvements and assign one's site, is found in the Commission's ordinances and not in the so-called "top-lease" between the Commission and the Robertses.

(C)

In about 2005, the Commission determined that upon the expiration of the Roberts lease, the Commission would discontinue having a Concessionaire, and would manage the campground directly.  The Commission agreed to purchase from Ms. Roberts the inventory, equipment and whatever residual property rights she might have.  The transaction closed, and the Roberts lease terminated, on October 16, 2007.

In anticipation of the expiration of the Roberts lease, on June 28, 2007, the Commission adopted the ordinance, one section of which is challenged in this case, Ordinance No. 2007-2.  The Ordinance provided

that beginning with the 2008 camping season, the practice of selling trailers in place would cease. The Ordinance provided further that henceforth when a lot lease (now with the Commission, not Concessionaire, as lessor) terminated, the lessee was to remove all property from the premises, or the Commission itself would remove the property. Ordinance No. 2007-2 also provided a six-month window of opportunity for campers to make a one-time sale of their trailers in place and their personal property to a transferee. None of the Plaintiffs took advantage of this opportunity, though a number of other campers did.

Section 5 of Ordinance No. 2007-2 further provided that any lessee who wanted to continue on at a camping site would have the right to do so and could renew the lease annually, indefinitely, subject to the Commission's right to lease a campground if the campground is closed for repairs or the Commission elects to discontinue the campground altogether:

> SECTION 5   SEASONAL CAMPSITE LEASES
>
> A. Except as set forth in subparagraph B, Seasonal Campsite Leases are executed by the Manager on behalf of the Commission on a first come, first-served basis. The Manager will maintain a waiting list of not more than 50

> prospective tenants.
>
> B. In any season, the Manager may elect not to lease any particular Campsite in the exercise of his or her discretion. However, whenever the Manager elects to lease a Campsite, then the tenant of such Campsite during the previous season shall have the right to renew the lease for the current season at the current fees established by the Fee Ordinance, so long as the tenant is in compliance with this Ordinance and has not breached the lease in the previous season.

Since June 2007, each of the Plaintiffs have remained on the campsites they occupied prior thereto. They have executed and then renewed their leases for the 2008 and 2009 camping seasons. Those leases all provide, with regard to renewals:

> 13. RIGHT TO RENEW: Landlord may elect not to lease the Premises to anyone in the season following the expiration of this Lease. However, if Landlord elects to lease the Premises in the following season, then Tenant shall have a right to renew this Lease for such season at the current fees established by Ordinance, so long as Tenant is in compliance with all Ordinances and regulations of the Landlord and has not breached this Lease.

The Commission contends that Plaintiffs have not been disturbed in the enjoyment of their campers and personal property at Otter Lake. Under their leases for the 2008 and 2009 camping seasons, they have had all the

9

benefits they had while sublessees of the Concessionaires. If one of the Plaintiff's leases is terminated or is not renewed, the Plaintiff may remove the improvements from the campsite. The Plaintiffs claim that the improvements, once removed, will have little value beyond scrap or salvage. The Plaintiffs have spent thousands of dollars on their improvements and had hopes of eventually recouping their investments. At least three of the four Plaintiffs considered their campground improvements to be personal, as opposed to real, property. At least sixteen campers have been able to lease lots from the new waiting list, which now has over 100 people on it. The Commission has never physically invaded the Plaintiffs' campsites.

(D)

The Plaintiffs' lawsuit, which was originally filed in state court before being removed to this Court, asserts two causes of action. In Count I, the Plaintiffs allege a claim under 42 U.S.C. § 1983 for an unconstitutional deprivation of their property rights, based on the Fifth and Fourteenth Amendments to the United States Constitution. Count II asserts a claim for inverse condemnation under Illinois law.

The Defendant contends that because Illinois law provides an adequate remedy for the Plaintiffs' inverse condemnation claim, a federal civil rights claim is inappropriate. Moreover, the Plaintiffs have not alleged the requisite destruction of a property right necessary for an inverse condemnation claim.

## II. ANALYSIS

The entry of summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322. The Court construes all facts and makes all reasonable inferences in favor of the non-moving party. <u>Magin v. Monsanto Co.</u>, 420 F.3d 679, 686

(7th Cir. 2005).

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. The Takings Clause was made applicable to the states through the Fourteenth Amendment. See Chicago Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 233, 236-37 (1897).

The Court must first address whether the federal claim is ripe. In Williamson County Regional Planning Commission v. Hamilton v. Hamilton Bank of Johnson County, 473 U.S. 172 (1985), the Supreme Court held that a plaintiff normally cannot claim that the Takings Clause has been violated until after it has sought compensation from the state. Id. at 194. "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." Id. at 195. In Peters v. Village of Clifton, 498 F.3d 727 (7th Cir. 2007), the Seventh Circuit discussed this issue:

> Because "[n]o constitutional violation occurs until just compensation has been denied," Williamson County, 473 U.S.

at 195 n. 13, 105 S. Ct. 3108, the Supreme Court has crafted a special ripeness doctrine that applies to claims arising under the Takings Clause. In Williamson County, the Supreme Court considered a claim for a temporary regulatory taking, occasioned by zoning regulations covering a particular plot of land. The Court affirmed the dismissal of the action by the landowner, holding it premature on two separate bases. First, the Court ruled that the landowner had failed to obtain a final decision from the state agency responsible for the taking. Williamson County, 473 U.S. at 190-94, 105 S. Ct. 3108 (explaining the final decision requirement). Second, the Court reiterated the principle that the Constitution does not prevent "taking[s]," but rather prohibits "taking[s] without just compensation." Id. at 194, 105 S. Ct. 3108. A state need not provide compensation prior to, or contemporaneous with, the alleged taking, so long as there is a "reasonable, certain and adequate provision" at the time of the taking for an injured property owner to obtain just compensation from the state after the taking has been accomplished. . . . Therefore, a plaintiff property owner cannot claim a violation of the Just Compensation Clause until he has sought and been denied compensation under available state court procedures. Id. at 194 n.13, 195.

Peters, 498 F.3d at 731-32.

The Seventh Circuit has observed that the Supreme Court held "that a plaintiff may be excused from the exhaustion requirement if he demonstrates that 'the inverse condemnation procedure is unavailable or inadequate.'" Daniels v. Area Plan Com'n of Allen County, 306 F.3d 445, 456 (7th Cir. 2002) (quoting Williamson County, 473 U.S. at 197)). The

13

claim is immediately ripe in federal court if the plaintiff can show that procedures for redress are either unavailable or inadequate. See Peters, 498 F.3d at 732.

Inverse condemnation is a recognized remedy under Illinois law. See Peters, 498 F.3d at 732-33. The Defendant alleges that by bringing such a claim, the Plaintiffs have in effect conceded that they have an effective remedy under state law.

The Plaintiffs contend that the Defendant's position is curious because this action is in federal court only at the behest of the Commission. Moreover, the Plaintiffs seek to distinguish this case from those on which the Commission relies by asserting that they did attempt to bring the inverse condemnation suit in state court. They contend that the Defendant's "procedural gamesmanship" should not be rewarded. However, the Court finds that this case should not be in federal court until state procedures are exhausted.

### III. CONCLUSION

The Court concludes that the Plaintiffs' section 1983 claims are

premature. Accordingly, summary judgment will be entered on ripeness grounds as to Count I. There is no basis for a section 1983 claim until and unless the inverse condemnation procedure is deemed inadequate. See Peters, 498 F.3d at 732.

It was Count I which provided the Defendant with a basis to remove the action to federal court. The Court finds that state court is a more appropriate forum to consider an inverse condemnation claim under Illinois law. Therefore, the Court declines to exercise its supplemental jurisdiction over Count II. See 28 U.S.C. § 1367(c)(3).

Ergo, the Defendant's motion for summary judgment [d/e 20] is ALLOWED as to Count I.

This case is hereby Remanded to the Circuit Court for the Seventh Judicial Circuit, Macoupin County, Illinois.

ENTER: February 8, 2010

        FOR THE COURT:

                              s/Richard Mills
                              United States District Judge